IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ALLEN S. THORNTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 10-CV-095-GKF-PJC |
| ) | |
| APAC, INC., and APAC-OKLAHOMA, INC., ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

This matter comes before the Court on the Motion for Summary Judgment (Dkt. #28) of defendants APAC, Inc. ("APAC"), and APAC-OKLAHOMA, INC ("APAC-OK"). The defendants seek summary judgment on all claims of plaintiff Allen S. Thornton ("Thornton") including his claims under the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), for a *Burk* public policy tort for age discrimination under Oklahoma law, and for intentional infliction of emotional distress ("IIED"). Following a hearing on the Motion for Summary Judgment, the court reopened discovery to take the deposition of Floyd Summers, an independent contractor who had done business with the defendants. The court directed parties to file supplemental briefs by September 13, 2011. The defendants filed a supplemental brief (Dkt. #50) but the plaintiff did not.

**I. Standard for Summary Judgment**

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler*, 144 F.3d at 670. In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## II. Material Facts

Defendant APAC-OK is a supplier of aggregates, asphalt, ready mixed concrete, and highway paving and construction services. It operates rock quarries, sand and gravel pits, asphalt plants and ready mixed concrete facilities. Defendant APAC is a sister corporation of APAC-OK. APAC-OK paid and, according to records, employed Thornton for roughly 25 years before terminating him on

October 3, 2008. Thornton worked first as a mechanic and was promoted to equipment manager in approximately 1997. In 2008, APAC-OK acquired a house located in a quarry; Thornton requested and received permission to rent the house. No specific rent terms were ever arranged. Thornton never paid rent on the house and lived there only a couple of months.

Thornton took scrap metal from APAC-OK property and sold it to purchase goods such as a dishwasher, range, and microwave which he placed in the rental property. Thornton also sold personal scrap metal during this time, and did not track how he spent the money nor did he differentiate between scrap metal from APAC-OK property and his personal scrap metal. Thornton never obtained permission from any APAC or APAC-OK supervisor to take the scrap metal, to sell it, or to use the proceeds to purchase goods for the rental house. Thornton received and acknowledged receipt of APAC-OK's Fraud Policy and Procedure which prohibits misappropriation of company assets or resources. After his termination, Thornton acknowledged that he should have obtained permission for these actions from the division president Jerry Kreymer ("Kreymer") and that he should have returned the proceeds from the sales to APAC-OK. (Dkt. #28-2, p.26).

On September 23, 2008, Kreymer learned Thornton had been taking company scrap metal, selling it, and keeping the proceeds. Kreymer investigated the matter and Thornton was terminated shortly after this investigation. Kreymer stated that Thornton was terminated for fraud and/or stealing related to the unauthorized sales of APAC-OK scrap metal. Kreymer states that the decision to fire Thornton was his alone[1], but Thornton was ultimately informed of the decision by both John

---

[1] Thornton argues that John Ringwald was also involved in the termination decision, because Ringwald's termination notes indicate that "Kreymer and I talked with Thornton and ultimately advised him that we had no choice but to terminate his employment." The fact that Ringwald joined Kreymer in informing Thornton that he was terminated does not contest the statements from Kreymer and Thornton that Kreymer was solely responsible for the decision to terminate Thornton. (Dkt. #28-4, p.8; Dkt. #28-2, p.17).

Ringwald and Kreymer.[2]

Thornton assumed Kreymer knew employees were selling scrap metal, but Thornton never talked to Kreymer or any of his other supervisors about it. The company's internal investigation did not reveal any other persons who were taking scrap metal and selling it for personal profit. There is evidence that an employee named Jim Richards[3] sold an APAC fork lift for scrap, but there is no evidence about what was done with the proceeds of this sale. A report prepared by John Ringwald actually indicates that Jim Richards sold the forklift on behalf of Thornton, not as part of a company intiative. Floyd Summers, an independent contractor, was explicitly authorized to clean up scrap metal and retain the profits from its sale, but he worked at a different quarry than Thornton. Summers had a different supervisor than Thornton, and Summers received permission to resell scrap metal from his own supervisor rather than from Thornton's.

Although the parties dispute who took over Thornton's job responsibilities immediately after his termination, there is no dispute that Kreymer assumed the responsibilities for several months and Fred Rector ("Rector") ultimately filled the open position. Kreymer is older than Thornton, and Rector is less than 18 months younger than Thornton.

Thornton was terminated one to three months after telling Biff Huckaby and fellow employee Jim Richards about some of his COPD and arthritis symptoms. Two months prior to his termination, Thornton attended a meeting where a "corporate lady" stated that "if we've got any people that are a little old and bad health, we need to replace them with younger employees to save us money on our

---

[2] Thornton argues that Biff Huckaby ("Huckaby"), a quarry general superintendent, assumed Kreymer, John Ringwald, and John Walker were all involved in Thorton's termination. Huckaby's assumption on a matter of which he has no personal knowledge is not evidence which disputes the statements of Kreymer and Ringwald.

[3] It is unclear from the record what Jim Richards' position in the company was.

health." Huckaby and Kreymer were present at that meeting, but there is no indication in the record that they heard or remembered the remark. John Walker, the regional vice president for APAC-OK and Kreymer's supervisor, occasionally made comments to Thornton such as "well, are you going to make it alright?" and "good thing we don't have to run a foot race."

Following his termination, Thornton applied for and received Social Security based upon his COPD and arthritis. Thornton swore under oath when applying for disability that he had been disabled and unable to work since the date of his termination, October 3, 2008. Thornton remains disabled and unable to work due to his COPD and arthritis. Thornton intends to go back to work once he gets his medical issues under control and gets "back on [his] feet." Thornton's doctor, Jerry Holms, diagnosed him as being "totally and permanently" disabled. Thornton does not contest that diagnosis, except that he intends to return to work some day. At no point did Thornton request any accommodation for his disability.

### III. Proper Defendants

"The law allows businesses to incorporate to limit liability and isolate liabilities among separate entities . . . The doctrine of limited liability creates a strong presumption that a parent company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993) (citing *Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1576 (10th Cir.), cert. denied, 498 U.S. 849 (1990); *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980-81 (4th Cir.1987)). A court generally looks to four factors to determine if two nominally separate entities constitute a single employer: "(1) interrelations of operations; (2) common management; (3) centralized control of labor

relations; and (4) common ownership and financial control." *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1322 (10th Cir. 2004) (citing *Bristol v. Bd. of County Comm'rs of the County of Clear Creek*, 312 F.3d 1213, 1220 (10th Cir.2002) (en banc)). "For purposes of finding shared liability, we 'generally consider the third factor–centralized control of labor relations–to be the most important.'" *Id.*

Thornton presents no argument or evidence as to the first, third, or fourth factors. The sole evidence Thornton offers to overcome the strong presumption against shared liability is that Kreymer reports to John Walker, who reports to APAC's president, Kirk Randolph. Summary judgment for the non-employer defendant is proper when, "[a]lthough the record establishes some common management between the two entities, it is not sufficient to satisfy the common management requirement of the single employer test." *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1071 (10th Cir. 1998). Thornton has presented no evidence of shared control of labor relations, and offers only conclusory statements that some common management justifies holding APAC potentially liable on this claim. The court finds this evidence insufficient to overcome the strong presumption that a separate entity is not liable for the employment torts of another. The Motion for Summary Judgment is granted in favor of defendant APAC, Inc. as to each of Thornton's claims. This ruling operates in the alternative to those discussed below.

### IV. Age Discrimination Claim

Age discrimination claims are governed by the *McDonnell Douglas* framework at the summary judgment stage, under which the plaintiff "bears the initial burden of establishing a *prima facie* case by a preponderance of the evidence." *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220

F.3d 1184, 1191 (10th Cir. 2000); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). "In the absence of facts tending to establish this initial inference, plaintiff is not entitled to the presumption of discrimination and a defendant is not required to defend against the charge." *Adamson v. Multi Community Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008). Nonetheless, to raise an inference of discrimination, the plaintiff's burden is "'not onerous', which is evidenced by the 'small amount of proof necessary to create an inference of discrimination.'" *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (citations omitted). After establishing a *prima facie* case, "the plaintiff raises a rebuttable presumption that the defendant unlawfully discriminated against [him]." *E.E.O.C.,* 220 F.3d at 1191. "The burden of production then shifts to the defendant who must articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff." *Id.*

"In termination cases, a *prima facie* case of age discrimination ordinarily requires the plaintiff to show that he or she was: (1) within the protected class of individuals 40 or older; (2) performing satisfactory work; (3) terminated from employment; and (4) replaced by a younger person, although not necessarily one less than 40 years of age." *Adamson*, 514 F.3d at 1146 (citing *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557-60 (10th Cir. 1996)). The fourth part of the test is generally not satisfied when the employee was replaced with "another worker insignificantly younger." *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1166 (10th Cir. 2000) (citing *Int'l Bhd. Of Teamsters v. U.S.*, 431 U.S. 324, 358 (1977)). When "plaintiff's replacement was only two years his junior–an obviously insignificant difference–the necessary inference of discrimination [is] precluded, and [the plaintiff] fail[s] to establish [a] *prima facie* case." *Id.* (citations omitted). Nonetheless, this is not a rigid rule: "[w]hile replacement by an older or insignificantly younger worker does not *per se* doom

7

a *prima facie* case if both are within the protected age group, the evidence must nevertheless be adequate to create an inference that the adverse employment decision was, in fact, motivated by plaintiff's age." *Adamson*, 514 F.3d at 1146 (citations omitted).

A few days after his termination, Thornton spoke with Biff Huckaby, who informed him that his job responsibilities had been split to several people in different shops. Thornton had "no idea" who had replaced him as equipment manager. The equipment manager position was first filled temporarily by Kreymer (who is older than Thornton) and then on a full time basis by Rector, who is less than a year and a half younger than Thornton. Thornton alleges that some of his job duties were performed by a younger person following Thornton's termination, but provides no evidence that he was replaced by a younger person. (Dkt. #28-2, p.18). The fact that a younger employee may have temporarily stepped in to do some of the work necessitated by Thornton's termination does not change the fact that his position was ultimately filled by older or insignificantly younger employees.

In his response to the motion for summary judgment, Thornton offers only the conclusory statement that "[p]laintiff has met his *prima facie* burden." The court is left to sift through the statements of facts to determine on what basis this could be true. Presumably, Thornton wishes the court to take heed of the statements of the unnamed "corporate lady." "[A]ge-related comments by non-decisionmakers are not material in showing the [defendant's] action was based on age discrimination." *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994). An exception to this rule exists, however, "when the record contains evidence from which a reasonable inference may be drawn that a decisionmaker adopted or relied upon the allegedly discriminatory statement in reaching its decision." *Cuenca v. Univ. of Kansas*, 101 Fed. App'x 782, 788 (10th Cir. 2004) (citations omitted). Here, although there is evidence that Kreymer was present when the

8

statement was made, there is no evidence that he heard, remembered, adopted, or relied upon the statement in question. The fact that Kreymer was present for this remark by an unspecified corporate employee is insufficient to establish a circumstantial inference that he adopted or relied upon the statement in terminating Thornton. Thus, the stray remark of the unnamed "corporate lady" is insufficient to establish a *prima facie* case of discrimination.

Thornton also suggests the court should consider John Walker's comments to Thornton such as "well, are you going to make it alright?" and "good thing we don't have to run a foot race." However, there is no evidence that Walker was involved in the decision to terminate Thornton, or that any of the decisionmakers adopted, relied upon, heard, or even knew about Walker's statements. Thus, these statements are also stray remarks and insufficient to establish a prima facie case of discrimination.

Thornton was terminated and first replaced by an older employee, and then replaced by an insignificantly younger employee. Viewing the facts and statements made in the light most favorable to the plaintiff, Thornton has failed to establish a *prima facie* case for age discrimination.

## V. ADA Claim

Thornton's ADA claims are also governed by the *McDonnell Douglas* framework. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). "To establish a *prima facie* case under the ADA, a plaintiff must demonstrate: (1) that [he] is a disabled person within the meaning of the ADA; (2) that [he] is qualified, that is, [he] is able to perform the essential functions of the job, with or without reasonable accommodation; and (3) that the employer terminated [his] employment under circumstances which give rise to an inference that the termination was based on [his] disability. *Id.*

9

(citations omitted). "[A] plaintiff's sworn assertion in an application for disability benefits that [he] is, for example, 'unable to work' will appear to negate an essential element of [his] ADA case–at least if [he] does not offer a sufficient explanation. For that reason, we hold that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, [he] must proffer a sufficient explanation." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).

Under the *Cleveland* standard, the "explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Id.* at 807. The plaintiff in *Cleveland* explained "the discrepancy between her SSDI statements that she was 'totally disabled' and her ADA claim that she could 'perform the essential functions' of her job. The first statements, she sa[id], 'were made in a forum which does not consider the effect that reasonable workplace accommodations would have on the ability to work.'" *Id.* Moreover, the plaintiff claimed that her statements of total disability were accurate "in the time period in which they were made" but that her situation had changed. *Id.* The Supreme Court found these explanations sufficient to create an issue of fact as to whether the plaintiff could demonstrate the ADA factors. *Id.*

Thornton seeks to explain his disability claims by asserting that he only intended the disability to be short term until he could get back to work. This is, at best, an aspirational assertion that provides no evidence of Thornton's current or future ability to return to work with or without accommodation. Thornton does not dispute his physician's diagnosis that Thornton is permanently and totally disabled. A plaintiff cannot lose his cake and eat it too. No reasonable juror could find

from the evidence presented here that Thornton is able to return to work and perform the essential functions of the job, with or without accommodation. The facts of this case are therefore distinguishable from those in *Cleveland*, and Thornton has failed to present a *prima facie* case of disability discrimination.

### VI. Nondiscriminatory Reasons for Termination

Even if Thornton could establish a *prima facie* case of discrimination, the defendants are entitled to summary judgment if it can show a nondiscriminatory reason for terminating Thornton. *Sanders v. Sw. Bell Telephone, L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008). "If the employer comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual–i.e., unworthy of belief." *Id.* (citations omitted). "A plaintiff who demonstrates pretext gets 'over the hurdle of summary judgment.'" *Id.* Theft of company assets is generally regarded as a non-discriminatory reason for termination. *Adams v. Gardner Constr. Group*, 2008 U.S. Dist. Lexis 56984, *5 (W.D. Okla. 2008).

Kreymer says he terminated Thornton because his investigation revealed that Thornton was taking scrap metal from the quarry and selling it for his own personal profit. These activities were conducted without the approval of Thornton's supervisors. It is undisputed that Thornton took scrap metal which belonged to one of the defendants. Despite the characterization of the materials sold as "scrap" metal, it is not in dispute that the metal had value. Thornton reported receiving $25-30 dollars per load of scrap. APAC received over $100,000 when it allowed a company to "clean up" a quarry site of all scrap and sell the scrap. Thornton took company assets without permission and

sold them. His actions constituted theft or fraud.

Thornton argues that the scrap metal was "invested" in the rental house the defendants owned. He admits, however, that he comingled company scrap with his own personal scrap, and that he did not track where the money went. The goods he purchased (such as a dishwasher, range, and microwave) and placed in the house were for his use. At the very least, Thornton admits he needed to obtain permission for his actions–something he did not do.

Thornton also argues that it was common practice for employees to sell scrap metal for personal gain. The argument, essentially, is that it is okay to steal from your employer because other people steal as well; the rationalization is insufficient to demonstrate that APAC-OK provided a pretextual reason for firing Thornton. The company investigation did not reveal any employees besides Thornton who were selling scrap metal for personal gain without authorization. Moreover, Thornton has offered no evidence of a single employee who sold scrap metal for personal profit, much less one who did so with overt or tacit company approval. Thornton does point out that Floyd Summers, an independent contractor, was explicitly permitted by management to clean up scrap metal and sell it for personal profit. This explicit arrangement with an independent contractor does not create any implied authorization for Thornton to take scrap metal and sell it for profit. Moreover, independent contractor Summers reported to a different person than Thornton, and worked at a different quarry, so his situation is not comparable to Thornton's. Thornton is unable to raise a genuine issue of material fact that would lead a reasonable juror to find that the reasons for his termination were pretextual.

### VII. *Burk* Tort Claim

To survive summary judgment on a *Burk* claim, a plaintiff must demonstrate that discrimination was a "significant factor" in his termination. *Medlock v. U.P.S., Inc.*, 608 F.3d 1185, 1197 (10th Cir. 2010) (citations omitted). "It 'requires a showing of more than a mere causal link,' in that 'a factor may be a cause without being significant.'" *Id.* (quoting *Elzey v. Forrest*, 739 P.2d 999, 1001-02 (Okla. 1987)). Discrimination must be more than "only one of many possible factors resulting in his discharge." *Id.*

It is not necessary for the court to repeat its recitation of the undisputed facts of this case here. Thornton has not demonstrated that any of the allegedly discriminatory remarks had a significant effect upon Kreymer or the decision to terminate Thornton. Thornton's personal sale of company scrap metal provided a strong justification for the decision to terminate him, and therefore it cannot be said that any of the alleged discrimination would have had a "significant" effect upon his termination. Summary judgment for the defendants on the *Burk* claim is granted.

### VIII. IIED Claim

"To recover damages for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Computer Publ., Inc., v. Welton*, 49 P.3d 732, 735 (Okla. 2002). The second element is the most difficult to satisfy. "In general, a plaintiff must prove that the recitation of defendant's conduct to an average member of the community would arouse the listener's resentment against the defendant and would lead the listener to exclaim 'Outrageous!'" *Id.*

As this court has previously observed, termination coupled with insensitive or unkind statements is generally insufficient to support a claim for IIED. *Amin v. FlightSafety Int'l, Inc.*, 2009 U.S. Dist. Lexis 111945, *12 (N.D. Okla. Dec. 2, 2009).

Taking the facts in the light most favorable to the plaintiff, no reasonable juror could find that the defendants' actions would lead an average member of the community to exclaim "Outrageous!" The alleged conduct in this case does not reach the level of extreme and outrageous conduct for which an IIED tort is an appropriate remedy. Summary judgment for the defendants on the IIED claim is granted.

### IX. Conclusion

For the reasons outlined above, defendants APAC and APAC-OK are entitled to summary judgment on Thornton's claims against them.

WHEREFORE, the Motion for Summary Judgment of defendants APAC, Inc. and APAC-Oklahoma, Inc. (Dkt. # 28) is granted.

IT IS SO ORDERED this 9th day of January, 2012.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma